THE FIRST NATIONAL BANK OF CENTRALIA ET AL.

v.

EDWARD B. MARSHALL.

*National Banks—Voluntary Liquidation—Disposal of Assets—New Bank—Rights of Stockholders—Estoppel—"Good Will"—Lease.*

1. Where a national bank has gone into voluntary liquidation in pursuance of the vote of all its stockholders, and all but one of them have united in organizing a new national bank under a different name, and the omitted stockholder has accepted dividends from the proceeds of nearly the entire

assets of the old bank, he can not claim to be a stockholder in the new bank nor a right to share in its earnings.

2. In the case presented, the complainant is estopped from complaining that the greater part of the assets were sold to the new bank, as he knew they were thus disposed of when he accepted his share of the proceeds.

3. The old bank having gone into voluntary liquidation had no " good will " to dispose of, independent of the value of the unexpired lease of the building which it had occupied.

[Opinion filed May 5, 1888.]

APPEAL from the Circuit Court of Marion County; the Hon. AMOS WATTS, Judge, presiding.

The First National Bank of Centralia was organized on the 23d day of March, 1865, with a capital stock of $80,000, divided into 800 shares of $100 each, in accordance with the National Bank Act. After its organization it did a regular banking business until it went into voluntary liquidation about one month prior to the expiration of its charter. The appel-lee was one of the original stockholders, and at the time the bank went into liquidation, he owned $20,500 of the bank stock. At a meeting of the stockholders regularly called, on the 30th day of January, 1885, the question was submitted whether the bank should go into voluntary liquidation under the provisions of the National Banking Act, and every stock-holder, including the appellee, voted to take such action and that it should take effect on the 25th day of February following.

On the 10th day of February, 1885, the Old National Bank of Centralia, one of the appellants herein, was chartered by the Controller of the Currency and organized with the same per-sons as officers and directors of the bank that constituted such officers and directory in the First National Bank. In this new organization the appellee did not become a stockholder. It seems from the record that Dr. Marshall, while holding a large amount of stock in the First National Bank, about Sep-tember, 1883, started a new bank in Centralia called the Ex-change Bank, and by so doing, divided the banking business of the city to some extent, and thereby injured the First National Bank in depriving it of business that it would other-wise have done to its profit.

This action on the part of the appellee created unfriendly feelings between the other shareholders of the bank and himself, and several efforts were made by the officers of the National Bank to purchase his stock, but he asking $200 per share, a sum too large in their opinion, they did not buy. Matters were in this condition from that time until the charter of the First National Bank was about to expire by the limitation of twenty years fixed in the National Banking Law for the existence of national banks. The officers, the directors and the shareholders, except appellee, desired to continue in the banking business but not with appellee, under the existing circumstances, and they corresponded with the Controller of the Currency, stating their wishes and asking his advice.

His answer appears in the record and it seems to be conceded by counsel for all the parties that it is a fair interpretation of the banking law upon the points submitted.

They were advised that unless the stockholders were unanimously in favor of a new organization to take the name of the former·bank, it could not be done. That if they retained the old name, that every stockholder in the expiring association would be entitled to a preference in the allotment of shares of the new association, in proportion to the number of shares held by them respectively. They were also advised that there was no legal objection to the stockholders voting to place the old bank in process of voluntary liquidation, and the formation of an independent association for banking purposes, and that the department would have no objection to such course. Full instructions were given how to proceed, and necessary blanks furnished by the department. Acting upon this advice, a meeting of the stockholders was called to determine what course of action should be pursued in regard to winding up the affairs of the old bank, and all. the stockholders seem to have been fully advised of the object of the meeting.

At this meeting every share of stock was voted in favor of putting the First National Bank in process of voluntary liquidation, the complainant below and appellee here voting more than one fourth of the shares of capital stock in favor of the proposition.

The matters of closing up the business, the disposing of assets of the bank and the distribution of the proceeds, were placed in the hands of the officers of the bank, especially the cashier, Mr. Kohl. When the bank ceased to do business, on February 25th, the newly chartered bank was prepared to, and did, commence a general banking business.

The United States bonds held by the bank to secure its circulation were sold to the new bank at the current rate in the market, and re-deposited to secure the circulation of the new bank. Other bonds were sold in the market for the current prices on day of sale. The greater portion of bills receivable were sold to the new organization, as well as all the fixtures and furniture belonging to the First National.

Within ten days after the bank went into liquidation, a dividend of $100 to the share, was declared, and Dr. Marshall received $20,500. Within twenty-five days a further dividend was paid, of $50 per share. This last dividend was not paid in cash, but by mutual arrangement the undisposed of local bonds and securities, amounting to nearly $40,000, were divided among the stockholders, the appellee selecting from the entire amount his *pro rata* share, according to the amount of his stock.

Additional dividends of five and one-half per cent. have been declared and paid, of which the appellee has received his proper share. Some assets of the bank still remain in the hands of Mr. Kohl, consisting of some real estate and notes of hand which, if converted into money, would probably pay not far from five per cent. additional.

In July, 1886, the appellee filed his bill in the Marion Circuit Court against the two banks and the directors and officers of the new organization, charging that the change of organization was for the purpose of "freezing him out," as a shareholder in the First National Bank; that the new bank was created with the funds of the First National, and the same persons constituted the officers and directory, and turned over to themselves all the assets of the latter bank, and the same has ever since been under the control and appropriated to the use of the "Old National Bank," the new organization; that

by such action the stock of complainant was arrested and its earnings closed, although the money was used to sustain the latter bank. That the new organization had converted to its own use the interest of the complainant in the First National without his consent, and that all the actions of the parties defendant were had for the purpose of cheating complainant. He asks for general and special relief, and especially that an account may be taken of the earnings of the new bank, and that it may be decreed to pay complainant such proportionate share of its earnings as the stock of complainant bears to the capital stock of that bank.

Answers were duly filed, a hearing had and a decree was rendered against all the defendants for over $8,000, and defendants bring the case here by appeal.

Other facts are stated in the opinion of the court.

Messrs. McCARTNEY & CASEY and CASEY & DWIGHT, for appellants.

Messrs. W. S. FORMAN and JAS. WATTS, for appellee.

PILLSBURY, J.   Section 5220 of the National Bank Act provides that "Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock." The sections following provide in detail for winding up the affairs of the bank when such vote has been taken.

It is clear that the stockholders had the right to put the First National Bank into voluntary liquidation rather than to permit its charter to expire by limitation, as it would have done on March 25, 1885. The appellee, as one of the shareholders, voted all his stock in favor of that course.

When the bank ceased doing business on February 25, 1885, it became the duty of those placed in charge of its affairs for the purposes of winding up its business to use all reasonable effort to realize out of the assets as much as possible and distribute the proceeds among the shareholders. When this has been done it is clear that the value of the stock can only be measured by the value of the assets. It is not contended by

appellee, neither could it well be, that the First National was not legally put into liquidation. The appellee states in his testimony taken on the trial that he voted for liquidation, and he knew this course had its inception in the desire to get rid of him as a stockholder by the organizing of another national bank. There can be no doubt of the right of the stockholders after such vote was taken, to organize a new bank and to dispose of the stock to whomsoever they saw proper, so long as they committed no fraudulent act to the injury of the appellee. The complainant, with full knowledge of what had been done in putting the one bank into liquidation and the organizing of a new one, and the disposition of the assets of the bank by its directory, for he was furnished with a detailed statement by Mr. Kohl, received a cash dividend of $100 upon each share of his stock, and joined with the officers of the bank in dividing up many of the remaining bonds and securities, selecting those he desired to take and thereby received $50 per share additional. Instead of objecting to the action of the directory and Mr. Kohl and refusing to take his share of the proceeds derived from the sale of the assets and demanding recognition as a stockholder, or demanding an equal amount of stock in the new organization and offering to pay for it, as others did, he voluntarily, with a full knowledge of the facts, receives his *pro rata* share of each and every dividend declared, and his explanation of this act is that he "never knew of any one objecting to receiving money," that he knew the new bank would be organized and he left, but he intended "to hold his grip."

He further says that when Mr. Kohl presented him with the statement of the disposition of the assets he "had no doubt to base an objection upon," although admitting, in fact, that he knew how the assets of the bank were disposed of. He has also received two additional dividends, amounting to $5.50 per share, and taken the money without objection, making in the aggregate $155.50 upon each share of capital stock held by him of the par value of $100, and the remaining assets, amounting, as estimated, to $4,536.39, consisting of notes and a farm which had not been converted into cash at

time of trial. As to these remaining assets, we think the proof shows that when Mr. Kohl called appellee's attention to them, at the time he paid the last dividend, he told appellee that if he wanted the matter closed up at once he, appellee, could buy them or they would buy them, and appellee then directed Mr. Kohl to keep on the way he had been doing.

Now, after receiving his share of the assets disposed of, belonging to the First National, under the circumstances stated, we are at a loss to comprehend how he can claim to be pecuniarily interested in the "Old National Bank," or entitled to any of its earnings.

He is, of course, entitled to a fair administration of the assets of the defunct bank, the First National, but upon what basis he can claim that his interest in such funds is to be measured by the present value of the stock in the new National Bank we can not perceive.

And yet the court below in its decree found that his stock in the First National Bank was of the value of $190.50 per share, when the assets as disposed of would not, perhaps, exceed in value $160 upon the share.

The record is barren of any proof that the assets of the First National Bank, in which appellee was a large stockholder, consisting of bonds and bills receivable, and furniture and fixtures, were not sold at the current rates in the stock market, except the fixtures and furniture, the value of which was fixed by the opinion of witnesses varying from $1,000 to $1,600. There is no evidence in the record that the United States bonds were sold to the Old National Bank at a less price than current quotations, nor that the bills receivable did not bring all they were worth, and, as to the $40,000 worth of local bonds and securities divided between the stockholders, the appellee can not complain, as he joined in the division and made his own selection for the stock, or surplus dividend of $50 per share. We have been unable to find any evidence in the record that justifies the action of the court below in finding that the stock of the appellee in the First National Bank was worth, when the vote for liquidation took effect, $190.50 per share. As we have said, if the assets of that bank were

properly administered, the value of the property of the bank would determine the value of the stock, and, if the assets were disposed of for their fair market value, the appellee has no reason to complain. We think he is estopped from insisting that the greater part of the assets were sold to this new organization, as he knew they were thus disposed of when he accepted his share of the proceeds; but if he can establish that, by an unlawful combination between the two banks, the assets were not sold for their fair market value, he can have an account taken of the value of his stock, based upon such fair value of the assets of the bank, and have a decree for such difference.

A mere honest difference of opinion between him and the other parties authorized to wind up the affairs of the bank, will not, however, render those officers, or the First National Bank, liable to account, but if it should appear, upon a re-trial of this case, that the First National Bank, through its custodian of the assets of the bank, had fraudulently disposed of the property of the bank for the purpose of aiding themselves at the expense of appellee, by selling them for less than their fair value, those taking part in such fraudulent practices must be held to respond to complainant below, and if it should appear that the Old National Bank was a party to such fraud, a decree might well go against it to account for the fair market value of all assets received by it for less than their fair value. We think the complainant is entitled to a fair and honest disposition of the property of the bank and is entitled to receive his just and fair proportion of the proceeds thereof, according to the amount of his stock in the bank compared with the entire capital. At the same time we hold that he can not claim to be a stockholder in the new bank, nor entitled to share in its earnings, nor object to the transfer of the assets of the bank in which he was a stockholder to the new organization, as, with a full knowledge of all the transactions, he took his money arising out of the payments made by the latter bank for such assets. The evidence is very conflicting as to the value of the fixtures, safe, books and blanks of the First National, sold to the Old National Bank. They were

carried on the books of the former bank at the value of $1,000 and were sold to the new bank for $1,000, and, if the correctness of the decree depended upon this item alone, we should not be disposed to interfere with it, but we are of the opinion that the court erred in finding from the evidence in this record that appellee's stock was of the value of $190.50 per share, upon the ground that he was equitably entitled in some way, to a share in the profits of the Old National Bank, and without determining whether the assets of the First National Bank had been fraudulently disposed of for less than their value to the injury of the appellee. What we have said disposes also of the question of the "good will" of the First National Bank which it is claimed was obtained by the Old National Bank, as the lease of the building was assigned to it and the business carried on in the same place.

The First National voluntarily closed its doors as a banking institution on the 25th day of February, 1885, and then ceased to exist as a banking institution. It did not, neither could it, thereafter dispose of its franchise held by it under the law. It had no "good will" to dispose of independent of the value of the unexpired lease for the bank building, This lease was made by appellee to the First National Bank, or its successor, in September, 1883, for five years, and the unexpired term was clearly an asset of the bank which should have been disposed of to the best advantage.

Upon a sale of it, the "good will" would necessarily enter into consideration in determining its value. Dougherty v. Van Nostrand, 1 Hoff. Ch. 68; Austin v. Bays, 24 Beav. 598.

If the parties appointed to wind up the business of the First National Bank have acted in good faith, and with reasonable diligence, they should be allowed a fair compensation for their services before final distribution is made of the remaining assets.

For the reasons stated the decree will be reversed and the cause remanded for further proceedings.

*Reversed and remanded.*